[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10453

_____

D.C. Docket No. 0:12-cr-60011-RSR-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NATHANIEL HOLT, JR.,
SCOTT W. BARNES,
ANDRE D. BARBARY,
MONICA I. LEWIS,
WILLIE J. HARTFIELD,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 30, 2015)

Before HULL, JULIE CARNES and WALKER[*], Circuit Judges.

HULL, Circuit Judge:

After a jury trial, defendants Nathaniel Holt, Scott Barnes, Andre Barbary, and Monica Lewis appeal their convictions for (1) conspiracy to distribute and possess with intent to distribute oxycodone and/or cocaine and (2) conspiracy to use a communication facility to facilitate a narcotics crime. Defendant Willie Hartfield also appeals his conviction for conspiracy to distribute and possess with intent to distribute oxycodone. Defendant Barnes also appeals his total 151-month sentence. After careful review of the entire record, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND

In January 2012, a federal grand jury returned an indictment against nine defendants: Andre Barbary, Scott Barnes, Kim Carswell, Willie Hartfield, Nathaniel Holt, Robert Jackson, Tamika Jasper-Barbary, Robert Lespinasse, and Monica Lewis.

The indictment charged the defendants with one count of conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine and oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(C), and 846 (Count 1); and one count of conspiring to use a communication facility to

_____
[*]Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

facilitate a narcotics crime, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 2).

The indictment alleged that the defendants committed Count 1 beginning on or about January 1, 2000, and continuing through on or about the January, 2012 date of the indictment, and committed Count 2 on or about February 1, 2010, and continuing through on or about the January, 2012 date of the indictment.

Four defendants—Carswell, Jackson, Jasper-Barbary, and Lespinasse—pled guilty to one or both counts. The remaining five defendants—Barbary, Barnes, Hartfield, Holt, and Lewis—proceeded to a nine-day jury trial in November 2012. Cooperating codefendants Carswell and Lespinasse testified at trial.

At trial the jury found all five defendants guilty of Count 1, with the following findings as to the type of drugs each defendant conspired to distribute and possess with intent to distribute, including, if applicable, the quantity of cocaine: (1) as to Holt, oxycodone and between 500 and 5,000 grams of cocaine; (2) as to Barbary, oxycodone and five kilograms or more of cocaine; (3) as to Barnes, oxycodone and between 500 and 5,000 grams of cocaine; (4) as to Hartfield, oxycodone; and (5) as to Lewis, between 500 and 5,000 grams of cocaine. The jury also found Holt, Barnes, Lewis, and Barbary guilty of Count 2, but found Hartfield not guilty of that count.

3

This appeal concerns Barbary's, Barnes's, Hartfield's, Holt's, and Lewis's convictions and Barnes's sentence.[1]  We begin with a summary of the procedural and factual history of the case, and then discuss the issues raised on appeal.

## II.  PRE-TRIAL MOTIONS

### A.    Holt's Motions to Suppress Currency Evidence

Before trial, defendant Holt filed motions to suppress currency evidence seized during two different traffic stops, in June 2007 and January 2010, on grounds that the officers allegedly had unreasonably prolonged the duration of both stops to allow time for a canine unit to arrive with a drug dog.  A magistrate judge held an evidentiary hearing as to both motions to suppress.  Below we outline the testimony presented at the hearing as to each traffic stop.

### B.    Testimony as to June 2007 Traffic Stop

On June 27, 2007, Lee County Sheriff's Office Deputy Raul Fernandez was patrolling a high-crime area "frequented by people with narcotics" in Fort Myers, Florida.  At approximately 4:06 p.m. that day, he initiated a traffic stop of a 2007 Chrysler 300 that was speeding at 59 miles per hour in a 30-mile-per-hour zone.

The Chrysler's driver and sole occupant was defendant Holt.  When Deputy Fernandez requested Holt's driver's license, Deputy Fernandez observed that Holt was "very nervous," was "breathing very heav[ily]," was "catching his breath,"

---

[1]Barbary, Hartfield, Holt, and Lewis do not raise any sentencing issues in this appeal.

4

was "sweating profusely," and failed to maintain eye contact. Deputy Fernandez testified that Holt's hands were shaking when he handed his driver's license. Deputy Fernandez asked Holt where Holt was coming from and going to, but Holt did not answer either question and simply "mumbl[ed] some words." Deputy Fernandez recognized Holt from Fernandez's time working in the narcotics unit of another police department, and Holt indicated that he recognized Fernandez, calling Fernandez by his "street name," "Pacman."

Deputy Fernandez then ran routine records checks to ensure that Holt's driver's license and the Chrysler's tag were valid and that Holt had no outstanding warrants. Additionally, based on Holt's behavior, Deputy Fernandez requested a canine unit to respond to the scene. During the records checks, for safety reasons, Deputy Fernandez asked Holt to stand outside the Chrysler. At that time, Deputy Fernandez asked Holt for permission to search the Chrysler, and Holt stated that Fernandez could "search the whole car."

While still waiting on the records check, Deputy Fernandez proceeded to search the Chrysler. However, when Deputy Fernandez attempted to open the locked glove box and requested Holt to unlock it, Holt declined. Deputy Fernandez stopped the search and began "writing the paperwork" for the traffic stop (including the speeding citation for 59 miles per hour in a 30-mile-per-hour zone). At this time, Deputy Fernandez observed that Holt "was pacing back and

5

forth in front of [Fernandez's] vehicle," "appeared to be agitated," and "was closing his fist." Concerned that Holt wished either to engage him or to flee, Deputy Fernandez asked Holt to sit in the back of his patrol car, and Holt agreed.

Before Deputy Fernandez had completed the paperwork associated with the traffic stop, including the speeding citation, the canine unit responded to the scene. At 4:33 p.m., Corporal Keith Dunn deployed his drug dog, which was experienced and qualified in detecting the odor of narcotics, to sniff around the exterior of the Chrysler. The dog alerted on the car's front passenger door. Deputy Fernandez retrieved the Chrysler's keys from Holt and unlocked the glove box in the dashboard in the passenger side, where Fernandez found rubber-banded bundles of cash totaling $45,940. The officers seized the cash. Thus, 27 minutes passed between the traffic stop at 4:06 and the drug dog's arrival at 4:33 p.m.

## C.    Testimony as to January 2010 Traffic Stop

On January 7, 2010, at approximately 11:17 p.m., Detective Stephen Kirkby of the Lee County Sheriff's Office pulled over a silver Honda SUV on Interstate 75 because one of its tag lights was not working properly. Holt was the driver of the SUV, and he had one passenger, Michael Mitchell. When Detective Kirkby approached the SUV's passenger's side window, Mitchell was staring at the floorboard, while Holt had his driver's license in hand and faced straight ahead

6

without looking at Kirkby.  Holt's hands were shaking as he handed his license to Detective Kirkby.

Consistent with standard procedure, Detective Kirkby asked Holt to exit the SUV and come back to stand near Kirkby's patrol car.  Before Holt got out of the SUV, he leaned over the middle console and whispered something to Mitchell that Detective Kirkby could not hear.  Once Holt exited the SUV, Detective Kirkby showed him the defective tag light, and Holt responded that the owner of the car, Mitchell, would fix it.

Detective Kirkby then ran routine records checks to ensure that Holt had a valid driver's license and no outstanding warrants.[2]  Detective Kirkby also requested a nearby canine unit to respond to the scene.  As Detective Kirkby was writing Holt a warning for the defective tag light and waiting on the records checks, he and Holt joked about Holt's outfit, a leather suit covered in "dollar signs."  Detective Kirkby also asked Holt about Holt and Mitchell's travel plans, and Holt responded that they had come from Opa-locka, Florida, the day before for the birth of Holt's nephew's son and had stayed off of Ballard Road in Fort Myers.  Detective Kirkby asked Holt the baby's name, but Holt could not remember it.

---

[2]The records check did not show any outstanding warrants, but did reveal to Detective Kirkby that money had been seized from Holt in 2007 and that Holt had prior drug charges and a prior murder charge.

7

Detective Kirkby noticed that Holt's answers to his questions were "very short and vague" and that Holt did not make eye contact with him.

After that exchange, Detective Kirkby walked back to the SUV and requested the SUV's registration papers from Mitchell. As Mitchell opened the middle console to look for the registration, Detective Kirkby observed that the console contained items normally stored by motorists in the glove box, such as the SUV's owner's manual. While Mitchell was looking for the registration in the middle console, Detective Kirkby asked him about his and Holt's travel plans, and Mitchell stated that they had come up to the area late that day to hang out with some friends for a few hours. Detective Kirkby asked whether they had come for a wedding, birth, party, or anything similar, and Mitchell responded in the negative, again stating that they had come that day to spend time with friends.

Once Mitchell handed Detective Kirkby the registration, Kirkby returned to his patrol car and again asked Holt about his stay in Fort Myers, and Holt repeated his claim that he had come up the day before for the birth of his nephew's child. However, Holt admitted that he had not brought a change of clothes and was wearing the same outfit as the day before. Holt also indicated that he and Mitchell had stayed at Holt's nephew's house. Detective Kirkby then asked Holt for permission to search the SUV, but Holt said that he was not going to give permission to search the SUV because it did not belong to him.

8

The traffic stop started at 11:17 p.m., and at around 11:20 p.m., the canine unit arrived with a drug dog that was experienced and qualified in detecting the odor of narcotics.  At the time of the canine unit's arrival, Detective Kirkby was still waiting on some of his records checks and had not yet completed the written warning.  Sergeant Steven Brady of the canine unit took the drug dog to the SUV, and the dog alerted to the SUV's driver's side door.  Detective Kirkby and Sergeant Brady searched the SUV and seized from the glove box on the passenger's side $31,260 in cash, rubber-banded and contained in trash bags.

**D.    District Court's Ruling on Holt's Suppression Motions**

The magistrate judge issued a report and recommendation ("R&R") recommending that the district court deny both of defendant Holt's motions to suppress.  As to the June 2007 traffic stop, the magistrate judge found Detective Fernandez to be credible.  Further, the magistrate judge found, prior to the arrival of the canine unit, the scope and duration of the detention did not exceed that of an ordinary traffic stop.  And, in any event, "by the time the K9 unit arrived, Detective Fernandez had an objectively reasonable, articulable suspicion that [Holt] was engaged in the illegal transportation of narcotics or currency."

As to the January 2010 traffic stop, the magistrate judge noted that it was unclear whether Holt even had standing to contest the search, as he did not own the SUV and told Detective Kirkby that he could not consent to its search.  Moreover,

9

even assuming that Holt had standing, the magistrate judge found that Detective

Kirkby testified credibly, and that, prior the arrival of the canine unit, the scope

and duration of the traffic stop did not exceed that of an ordinary stop.  And,

regardless, "by the time Sergeant Brady arrived with [the drug dog], Detective

Kirkby had an objectively reasonable and articulable suspicion that [Holt] was

engaged in illegal activity."

Overruling Holt's objections, the district court adopted the R&R and denied

Holt's motions to suppress.

**E.    Barbary and Lewis's Motion to Suppress Wiretap Evidence**

Defendant Barbary filed a motion, adopted by defendant Lewis, to suppress

conversations recorded through wiretaps on Barbary's cell phones between August

2011 and January 2012.  The motion to suppress argued, in relevant part, that the

government failed to demonstrate "necessity" for the wiretaps under the federal

wiretapping statutes.

Following an evidentiary hearing, the magistrate judge issued an R&R

recommending that Barbary and Lewis's motion to suppress be denied on grounds

that, in compliance with the wiretapping statutes, the wiretap application "more

than adequately described what other investigative procedures have been tried and

failed or why they reasonably appeared to be unlikely to succeed if tried or to be

10

too dangerous."  Neither Barbary nor Lewis filed objections to the R&R, and the district court denied their motion to suppress.

## F.      Lewis's Motion to Suppress Evidence from GPS Tracker

Defendant Lewis filed a motion to suppress evidence obtained through a Global-Positioning-System ("GPS") tracking device that federal law enforcement agents attached to her vehicle on September 21, 2011, and left there for 8 days until September 29, 2011.  Lewis argued that in September 2011 the agents attached the GPS tracker without a warrant, in violation of her Fourth Amendment rights now recognized in United States v. Jones, 565 U.S. __, 132 S. Ct. 945 (2012), which the Supreme Court decided in January 2012.

The government responded to Lewis's motion to suppress, contending, in relevant part, that the exclusionary rule was inappropriate in this case because the agents had acted in good faith reliance on pre-Jones precedent in attaching the GPS tracker to Lewis's car without a warrant.  Specifically, under United States v. Michael, 645 F.2d 252 (5th Cir. 1981), when they attached the GPS tracker, the agents had reasonable suspicion to believe that Lewis was involved in illegal narcotics-related activity, and thus their warrantless installation of the device did not run afoul of the Fourth Amendment.

11

The government submitted uncontroverted evidence showing the following.[3] On August 24, 2011, the district court had signed an order authorizing a wiretap of Barbary's cell phones, finding that there was probable cause that Lewis, among others, was engaged in criminal activity. Subsequently, in support of an October 2011 warrant application not at issue in this appeal, a Drug Enforcement Administration ("DEA") special agent summarized the contents of phone calls intercepted through the wiretap of Barbary's cell phones. Relevant here, the DEA special agent averred that multiple intercepted phone calls and text messages on August 26, 2011—prior to the September, 2011 installation of the GPS tracker on Lewis's car—indicated that "BARBARY is clearly involved in drug trafficking and that LEWIS is conspiring with him to further the goals of the [drug-trafficking organization]."

Following oral argument, the magistrate judge issued an R&R recommending that Lewis's motion to suppress as to the GPS tracker be denied. The magistrate judge found that law enforcement officers installed the GPS tracker on Lewis's car while it was parked in a public space, without a warrant, "based on intercepted conversations establishing that [Lewis] was traveling between South Florida and the Fort Myers, Florida area, transporting money and cocaine." However, the officers had acted in strict compliance with pre-Jones precedent from

_____

[3]The parties agreed that Lewis's motion to suppress would be decided without testimony based on their written submissions.

this Circuit providing "that the warrantless installation of a tracking device on a vehicle, when based on reasonable suspicion, was permissible."  Thus, the magistrate judge found that suppression was inappropriate, citing Davis v. United States, 564 U.S. __, __, 131 S. Ct. 2419, 2428-29 (2011) (holding that the good-faith exception to the exclusionary rule under United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984), applies when the police conduct a search in objectively reasonable reliance on binding judicial precedent).

Overruling Lewis's objections, the district court adopted the R&R and denied Lewis's motion to suppress as to the GPS tracker.

## G.     Notice of Rule 404(b) Evidence and Motion in Limine

Before trial, the government filed notices of Federal Rule of Evidence 404(b) evidence that it may introduce in its case in chief, including in relevant part: (1) testimony by a cooperating co-conspirator, L.B. (Lamar Bennett), that defendant Barbary sold cocaine and heroin prior to January 1, 2000, the date on which the indictment alleged the conspiracy began; and (2) defendant Barnes's prior felony drug convictions in October 2002 for possession of cocaine with intent to deliver and trafficking in cocaine.  As to the former evidence, the government argued that the evidence either was necessary to complete the story of the crimes charged and inextricably intertwined with the evidence regarding the charged crimes or was admissible under Rule 404(b).

13

As to the evidence of Barnes's prior convictions, the government argued that the evidence was relevant and admissible to prove intent. Barnes filed a motion in limine to exclude the evidence of his prior felony drug convictions. Following a response by the government and a hearing, the district court denied Barnes's motion in limine. At trial, the district court admitted certified copies of Barnes's prior felony drug convictions. Both when the district court admitted the evidence and when it instructed the jury before deliberations, the district court gave this Circuit's pattern jury instruction regarding Rule 404(b) evidence.[4] In closing, the government argued that Barnes's prior cocaine convictions were in evidence because they showed his intent to distribute cocaine.

## III. THE TRIAL EVIDENCE

At trial, the government presented abundant evidence of the defendant-appellants' guilt, including in the form of cooperating co-conspirators' testimony; investigating agents' testimony; evidence obtained through searches of the

---

[4]Specifically, the district court's instruction as to Rule 404(b) evidence stated that, during the trial, the jury will hear, or did hear, evidence of acts done by the defendants

on other occasions that may be similar to acts that the defendants are currently charged with. You must not consider any of this evidence to decide whether the defendants committed the acts charged now, but you may consider this evidence for other very limited purposes. If other evidence leads you to decide beyond a reasonable doubt that [the defendants] committed the charged acts, you may consider evidence of similar acts done on other occasions by the respective defendant to decide whether the respective defendant had the state of mind necessary to commit the crime charged.

14

conspirators' vehicles and homes; travel, financial, and phone records; and recorded phone calls among the conspirators.

## A.    Cooperating Co-Conspirators' Testimony

Government witness Lamar Bennett, who was convicted in a separate case, testified that he had known defendant Barbary since the ninth grade and that he and Barbary began "[s]elling drugs on the corner" together in Opa-locka in 1995.[5] Barbary would pay Bennett $100 per day to sell $4,500 to $5,000 worth of drugs, including crack cocaine, powder cocaine, and heroin. Bennett was incarcerated from 1996 to 2000. When Bennett was released from prison in 2000, Barbary was transporting cocaine from Florida to South Carolina in quantities of three to five kilograms at a time. Bennett, joined sometimes by defendant Hartfield, accompanied and assisted Barbary on six or seven trips transporting cocaine to South Carolina.

Bennett further testified that, sometime after 2007, he started transporting tens of thousands pills per month from South Florida into Alabama, including pills supplied by Barbary. During that time period, Bennett also was purchasing cocaine from Barbary to sell in Alabama. Defendant Barbary sometimes used defendant Holt to deliver drugs to Bennett. Defendants Barbary, Hartfield, and Holt, as well as Bennett, all used cell phones to contact each other concerning their

---

[5]Counsel for Barnes objected to this testimony, stating, "Judge, I am going to object. This is 1995. It is outside the scope of the indictment."

15

drug organization and used code words to discuss drug deals.  Barbary kept multiple cell phones, and routinely would change out his phones out of fear that the government was monitoring his calls.

Bennett additionally testified that, prior to his arrest in April 2011, he also assisted defendant Barbary in packaging cocaine for delivery to Robert Jackson on the west coast of Florida.  Kim Carswell and defendant Lewis transported the drugs to the west coast of Florida.  On cross-examination, Bennett conceded that he had not personally seen Lewis with drugs, but he had seen her arrive at Barbary's house with large amounts of cash.  Moreover, Bennett testified, Barbary had told him that Lewis "was across the street," which Bennett understood to mean that Lewis was on the west coast of Florida delivering drugs.[6]

Finally, Bennett testified that defendant Barbary's organization was also transporting drugs into Boston, Massachusetts.  Cooperating codefendant Carswell also testified that, in September 2010, Barbary had her "go pick up the money from Boston" after defendant Hartfield was arrested at a train station in Boston with pills in his possession.  Ultimately, Carswell made four to six trips to Boston via plane for Barbary, picking up around $75,000 in cash each time.

---

[6]Lewis's counsel did not contemporaneously object to this testimony.  Rather, Lewis's counsel stated, after Bennett's testimony concluded, that he wished to reserve on a motion at the end of the day.  After the jury was excused for the day, Lewis's counsel made a hearsay objection to Bennett's testimony about Barbary's statements as to Lewis being "across the street."  The district court overruled the objection because it was untimely and the testimony was admissible under Federal Rule of Evidence 801(d)(2)(E).

Cooperating codefendant Robert Lespinasse testified that he moved into the apartment underneath defendant Holt's unit in summer 2011. After Lespinasse lost his job, Holt indicated that he was willing to help Lespinasse sell drugs. Holt told Lespinasse that Holt and Barbary were "moving cocaine out of town" and selling heroin, and that Holt used to transport oxycodone up to Boston. Lespinasse further testified that, after he purchased a half-ounce of cocaine from an unspecified source, Holt arranged to have Barbary cook the cocaine into crack cocaine for him. And later Barbary asked Lespinasse if Lespinasse's source would sell Barbary a kilogram of cocaine. Subsequently, Lespinasse sold Barbary a half-kilogram of cocaine for $14,400 and a quarter-kilogram of cocaine for $7,200.

## B.    Seizures of Currency Evidence

Law enforcement seized multiple large sums of cash from the conspirators between 2007 and 2011. The jury heard testimony as to the above-described June 2007 and January 2010 traffic stops of defendant Holt that resulted in the seizure of $45,940 in cash and $31,260 in cash, respectively.

Additionally, in January 2011, when Carswell attempted to pass through security screening at Boston Logan International Airport, a large amount of cash was discovered among her things. Ultimately, law enforcement was alerted and $76,040 was seized from Carswell at the airport.

17

In March 2011, law enforcement intercepted a box containing approximately $58,000 in cash sent through the mail from "Ron Smith, 148 Main Street, Foxboro, Mass" to "Can't Stop Trucking" in Hollywood, Florida.  At the time, Carswell's point of contact in Boston was Ricardo Stevenson, who would meet with Carswell and give her the money to return to Barbary.  His address was 149 Main Street in Foxboro, Massachusetts.

The evidence showed that Can't Stop Trucking was defendant Barbary's trucking company that was run out of his residence at the Florida address listed on the package.  Following the interception of the package, a police officer went to that address and spoke with defendant Lewis, who claimed to be the manager of Can't Stop Trucking.  Lewis denied that the business ever received boxes of cash in the mail.  Lewis also denied that she had a contact number for Barbary.  However, phone records showed that Lewis and Barbary called each other around 30 times between March 23 and 24, 2011.

Finally, federal agents searched Jackson's house in Fort Myers on December 2, 2011, and seized approximately $20,000 in cash, which a drug dog alerted on.

## C.    Seizures of Oxycodone and Cocaine from Defendants

As mentioned in Carswell's testimony, defendant Hartfield was arrested in September 2010 at a Boston train station with oxycodone and other pills in his possession.  Evidence at trial showed that, between June and September 2010,

18

Hartfield made multiple two-day train trips from Florida to Boston. Hartfield's train tickets were purchased with a Visa Netspend prepaid debit card ("Netspend card") in his name. However, the billing address, email address, and phone number associated with the Netspend card belonged to Barbary. Hartfield's September 2010 train ticket had two associated phone numbers, one belonging to Barbary and one belong to Hartfield.

On September 24, 2010, Hartfield arrived in Boston from Hollywood, Florida, via train. Upon his arrival, Hartfield was arrested on an outstanding warrant by DEA Special Agent David O'Neill. After receiving Miranda[7] warnings, Hartfield stated that he wished to cooperate and admitted to Agent O'Neill that he had, on four to five prior occasions, transported oxycodone from Florida to Boston. A search of the bag that Hartfield brought on the train trip revealed more than 9,300 oxycodone pills.

Following Hartfield's arrest, while he remained in custody, activity on the Netspend card continued, including in South Florida. In particular, deposits totaling more than $8,000 were made onto the card between September 2010 and March 2011. Additionally, records from the travel website Expedia showed that multiple trips between February 2010 and June 2011 were booked using the Netspend card through an Expedia account registered under Barbary's name.

---

[7]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

On September 29, 2011, a police officer pulled over a car driven by defendant Lewis, with an infant child in the backseat, on I-75 near Fort Myers, Florida.[8]  Because Lewis's license was suspended, the officer wrote Lewis a citation, arranged for a tow of Lewis's vehicle and transportation for Lewis to a nearby 7-Eleven where she could wait for a ride, and told Lewis she could take essential items for the baby.  Lewis wanted to take a large baby stroller and a box of laundry detergent with her.  When the officer told Lewis that there was not room in the transport vehicle for the items, Lewis said that she would return the stroller but insisted on keeping the detergent.  However, the officer did not allow Lewis to take the detergent.  Law enforcement subsequently discovered inside the box of detergent two vacuum-sealed bags containing a total of 613.2 grams of cocaine.

**D.       Wiretap Evidence and DEA Agent Amber Sargent's Testimony**

Pursuant to district court orders, four of defendant Barbary's cellphones were tapped and monitored by federal agents from August 24, 2011, through January 13, 2012.  The government's lead case agent, DEA Special Agent Amber Sargent, testified that she reviewed at least 99 percent of the thousands of phone calls and text messages that were intercepted over the wiretaps.

---

[8]GPS tracker evidence indicated that Lewis was coming from Broward County, Florida, at the time she was pulled over.  Gate records for the gated community where Jackson lived in Fort Myers, Florida, showed that Lewis made the approximately five-hour roundtrip from Broward County, Florida, to Fort Myers to visit Jackson 16 times between March and December 2011.

Overruling objections by defendants Holt, Barnes, Lewis, and Barbary, the district court admitted Agent Sargent as an expert witness in the area of drug-trafficking organizations' techniques to avoid detection, including use of coded language, and permitted her to testify as to the meanings of code words and phrases used by the conspirators on intercepted communications. Agent Sargent testified that she had been a DEA special agent for more than six years, had experience in narcotics investigations, and had experience working on two prior wiretap investigations. Agent Sargent was the lead case agent in one of those prior wiretap investigations, and the surveillance team leader in the other. She also was knowledgeable about common prices for particular quantities of illegal drugs.

Agent Sargent further testified that, based on her training and experience, she had learned that drug-traffickers sometimes used code words for controlled substances. As to this case, she formed opinions as to the meanings of the coded language used by the conspirators in the intercepted communications based on her training and experience, the investigation, logic, and the content and context of the communications. Although an untrained person possibly could listen to an intercepted phone call and accurately guess as to the meaning of certain words, Agent Sargent testified, her training and experience, knowledge of the investigation, and ability to understand the context of the calls enabled her to more

21

accurately interpret the code words and language than either a lay person or the prosecutor.

In rejecting the defendants' arguments that Agent Sargent was not qualified to testify as an expert witness, the district court found Sargent's testimony admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), based on her training as a DEA agent, her prior experience both on wiretap cases and generally as an agent, and the extent of her involvement in this particular case.  The district court then instructed the jury: "A scientific technical or other specialized knowledge might be helpful, a person who has training and experience in that field is allowed to state an opinion about that matter, but that doesn't mean you must accept the witness's opinion.  As with any other witnesses's [sic] testimony, you must decide for yourself whether to rely on that opinion."

The government played for the jury numerous recorded cell phone conversations between defendant Barbary and other conspirators, and asked Agent Sargent after some of the recordings, based on her training and experience, to explain or interpret various words and phrases used by the conspirators.

For example, in an August 26, 2011, phone call, Barbary told defendant Lewis to take "that thing in the glove . . . [and] weigh all that right quick."  Lewis then sent a text message to Barbary, stating: "446.2," to which Barbary responded:

22

"Put all2gether n seal it."  Agent Sergent testified that she believed that Barbary was texting Lewis to weigh an illegal substance and seal it.

On August 28, 2011, defendant Barnes told Barbary that he had, in the morning, "served a lil bit," and then later in the day, again "served a lil."  Later in that call Barnes also said that he had spoken with an individual who "say[s] he can move it" and whose "home boys had one down there in Lauderdale."  Barbary responded that Barnes should "get at [Barbary] tomorrow."  A few days later, Barbary asked Barnes whether Barnes had "check[ed] with the boy about the thing."  Barnes responded that the person had three people at five different doctors. Barbary asked "[h]ow much they suppose[d] to get," and Barnes responded, "Three hundred."  Agent Sargent testified that she believed Barnes's statements about "serv[ing] a lil" referred to distributing drugs, and that Barnes and Barbary's conversation about "three hundred" and having three people at five doctors "referr[ed] to doctor shopping for Oxycodone pills."

On September 10, 2011, in a phone call with Jackson, defendant Barbary asked, "[H]ow long you think she have the key?"  Jackson replied, "I don't know . . . I got to hit him up . . . he want a son too."  Agent Sargent testified that "key" meant kilogram and the term "son" referred not to a child, but to a drug quantity that was less than a kilogram.  Later that day, Jackson and Barbary discussed grabbing "a son," "the one crazy," that Jackson was "already started on [his]

23

second son," and that "both of the crazy gone." The next day, Barbary asked Barnes whether Barnes was "ready on that," and Barnes replied, "Naw . . . three left."

In a September 14, 2011, phone call with Adrian Garvin, Barbary asked Garvin whether the "moonlight blu ray movie came out?" When Garvin responded affirmatively, Barbary inquired as to the price. Garvin said it was "$30, and Barbary replied, "Oh the whole big DVD? . . . [T]hat's kind of steep right now." Garvin suggested that he could "maybe politic with the [person]," and Barbary said, "Alright, I'll hit you when I'm in the area tomorrow." Agent Sargent testified that she believed that the "$30" on a "whole big DVD" referred to $30,000 for a kilogram of cocaine.

Shortly thereafter, in a phone call between Barbary and Jackson, Jackson said that his "last son bitch, that bitch weighed two twenty eight . . . I got one more son left, the little short one . . . I told you to, got to buy them sons dog." Later in the call, Barbary said, "I going to throw you that grown over there . . . . I'm just waiting on a mother fucker to come." Jackson responded, "If I do the son for the all eight two fifty. . . . that will be thirty-three . . . I'm trying to keep that shit moving." Agent Sargent testified as to her opinion that "228" referred to 228 grams, the "little short one" referred to the 228 grams, and the "eight two fifty" referred to the price of a "son," which she believed to be a quarter-kilogram of

24

cocaine based on the price of cocaine and the fact that "four times 8,250" would equal "$33[,000]."

Barbary and defendant Barnes, in a September 16, 2011, phone call, discussed that Barnes's "cousin" had called and "[s]aid it's supposed to be comin to him." Barnes told Barbary that the "cousin's" "number ain't gonna be what you be . . . trying to get. . . . Be like, what you gonna say something over 30, 30 or better?" Barbary said that would not work and to "see if he say something under that." Barbary and Barnes agreed on "29 or better." Agent Sargent testified that she believed that "29" and "30" referred to the price of a kilogram of cocaine, $29,000 or $30,000. Barnes and Barbary spoke again on September 18, 2011, and Barbary asked, "You ready for me?" Barnes responded, "Not yet. . . . Three left."

In a September 21, 2011, phone call with Barbary, Barnes complained that he was "[l]osing all of [his] god damn customers. One got killed, one in jail." Agent Sargent testified that she believed that Barnes was referring to his customers in the drug business.

On September 26, 2011, Jackson told Barbary, "I'm doing my last son mighta wanted a grown man," and Barbary said, "I can probably still pull one or two out of my hat." That same day, Barbary asked Barnes whether Barnes was "ready," and Barnes said he was "working on the last one." The next day, Barnes told Barbary that "Cousin said thirty," and Barbary responded that he did not want

25

it because "that number is too high." Later that day, Jackson notified Barbary that he would "be ready for a grown tomorrow if you still got it," and Barbary said, "I do." In a subsequent phone call, Barbary asked Jackson, "How long before you kill that other son?," and Jackson replied, "[P]robably like tomorrow." Agent Sargent testified as to her opinions that "30 being $30,000" referred to the price of a kilogram of cocaine, and that "grown" and "son" meant a kilogram and quarter-kilogram of cocaine, respectively.

In an October 13, 2011, phone call between Barnes and Barbary, Barnes referred to a person who "wanted some some [sic] crazy." Barbary said, "Alright what you wanna get it in the morning?" Barnes replied, "Yea." The next day, Barbary told Barnes, "I'm gonna have you meet me at the lake." Agent Sargent testified that she believed "the lake" referred to a house in Opa-locka and that a cooperating codefendant had told her that "crazy" meant heroin.

During an October 30, 2011, phone call between defendant Holt and Barbary, Barnes—using Holt's phone—got on the line with Barbary at one point, indicating a connection between Holt and Barnes. Additionally, in two other phone calls between Barbary and Holt, Holt referred to earlier conversations between himself and Barnes.

On November 23, 2011, Barbary and Barnes had a conversation in which Barnes twice referenced "the regular."[9]  On November 25, 2011, Barnes said that he "already got the cheese" and asked Barbary whether Barbary had "the crazy." The next day, after Barnes complained that he was no longer Barbary's "main man," Barbary said, "[W]e gonna get together."  Barnes asked, "On the crazy or the other thing," and Barbary said, "Everything."

## E.    Search Warrants

On December 15, 2011, federal agents executed a search warrant at defendant Holt's apartment in Opa-locka, Florida.  After officers knocked and announced their presence, a red plastic cup containing 20 oxycodone pills was thrown by one of the apartment's occupants out of a window, and officers entered and found Holt and his girlfriend present in the apartment.

Federal agents then executed a search warrant on Barbary and Jasper-Barbary's residence on January 13, 2012.  The residence contained security cameras on all four corners.  Agents seized a book called "Busted By the Feds, The Book: Defendants facing federal prosecution, including the latest sentencing guidelines for all federal crimes"; a computer with documents regarding heroin and asset forfeiture in drug cases; and a computer that, in an account assigned to Lewis,

---

[9]One of the DEA investigating agents testified on cross-examination that "the regular" refers to cocaine.

contained photographs of a large amount of money. When Barbary was arrested, the Netspend card was on his person.

## IV. MID-TRIAL MOTION FOR RECESS

The trial in this case began on Tuesday, October 23, 2012. Trial was not conducted on Fridays, October 30, or November 6. At the end of the day on Monday, November 5, the government stated it might rest late Wednesday, November 7, and that the defense should be prepared for that.

At the end of the day on Wednesday, November 7, the government informed the district court that it would likely rest prior to lunch on Thursday. The district court instructed the defendants' attorneys to make sure that arrangements were in place with any defense witnesses in order to proceed on Thursday. The government rested just after 2 p.m. on Thursday, November 8.

Later that same day, the last defendant before Lewis rested when "at least forty minutes of scheduled court time remained in the day."[10] Lewis's lawyer said that he needed to speak to Lewis about testifying, and the district court allowed him a moment to speak with Lewis. Then, defendant Lewis herself addressed the district court and stated that she needed additional time, specifically until Monday, to prepare to testify. Lewis conceded that her attorney previously had discussed

---

[10]The district court found that significantly more time in the day would have been left if not for "Defendant Lewis's counsel's behavior earlier in the day, which appeared to this Court to be stalling" through unnecessarily long examinations of two witnesses.

testifying with her, but claimed that he had not "talk[ed] about doing it today."

Lewis also said, "I have my subpoenas for my witnesses, and I just got them

today."

> The district court stated:

> The case has been set for several weeks. . . . I've been saying you better be ready to put on a case.  You're telling me that you didn't even put out the subpoenas. . . . If you want to testify you have the time now, and today is when you need to do it.  I leave that to you.  You can discuss it for another minute or two.  You've had a lot of time to talk to your attorney.  We've been making this jury wait for a long time.

Lewis and her lawyer conferred again, and Lewis's lawyer announced that they

were resting.

After excusing the jury and conducting a charge conference, the district

court asked Lewis's attorney to make a proffer of what Lewis's witnesses would

have said.  Lewis's lawyer stated that a witness from Can't Stop Trucking would

testify that text messages by Lewis could have referred to "fuel figures"; another

witness would testify that Lewis worked long hours at Can't Stop Trucking; and a

third witness would testify that he was involved in music with Lewis and Jackson.

On the next day of trial, prior to closing arguments, the defendant-appellants

renewed motions for judgments of acquittal, but Lewis did not request to testify or

present evidence.

29

## V.  POST-TRIAL MOTIONS

### A.    Motions for Judgments of Acquittal

At trial defendants Holt, Barnes, and Hartfield orally moved for judgments of acquittal.  After trial, these defendant-appellants filed written motions for judgments of acquittal on various grounds.  Only Barnes raised the argument that he was entitled to a judgment of acquittal because the government proved multiple conspiracies at trial instead of a single conspiracy as alleged in the indictment.  The district court denied the motions for judgments of acquittal.

### B.    Lewis's Motion for a New Trial

Defendant Lewis moved for a new trial due to the district court's refusal to recess the trial to allow her additional time to prepare to testify.  Following a response by the government, the district court denied the motion.

## VI.  SENTENCING

Defendant Barnes is the only defendant to raise a sentencing issue on appeal. The presentence investigation report ("PSI") noted that a base offense level of 32, pursuant to U.S.S.G. § 2D1.1(a)(5), was appropriate for Barnes based on the Drug Quantity Table.  However, because Barnes qualified as a career offender, his offense level became 37, pursuant to U.S.S.G. § 4B1.1(b).  In particular, Barnes had prior felony convictions in 2002 for possession of cocaine with intent to sell and trafficking in cocaine, an offense that involved cocaine, ecstasy, heroin, and an

30

attempt to flee from police. Barnes also had unscored prior felony convictions for possession of cocaine and for several misdemeanors, from 1994 to 2000. Although Barnes's criminal history category would have been III based on his total of six criminal history points,[11] the PSI recommended a criminal history category of VI based on his career offender status, under § 4B1.1(b). With a total offense level of 37 and a criminal history category of VI, Barnes's advisory guidelines range was 360 months' to life imprisonment. He faced a statutory sentencing range of 10 years' to life imprisonment.

At sentencing, the parties alerted the district court to the probation officer's recent discovery that Barnes's prior felony drug conviction for trafficking in cocaine could not properly qualify him as a career offender, under United States v. Shannon, 631 F.3d 1187 (11th Cir. 2011), without reference to Shepard[12]-approved documents. Rather than delay the sentencing hearing, the parties agreed to stipulate to an offense level of 32, a criminal history category of III, and a guidelines range of 151 to 188 months' imprisonment, Barnes's advisory guidelines range in the absence of his career offender designation.

Barnes argued that a downward variance from 151 months to the statutory ten-year minimum was appropriate because he was a minor player in the drug-

---

[11]In contrast, codefendants Barbary and Lewis both received zero criminal history points.

[12]Shepard v. United States, 544 U.S. 13, 125 S. Ct. 1254 (2005).

31

trafficking organization.  Barnes contended that the trial evidence showed that he was not very successful in distributing narcotics, and that he never possessed any large amounts of narcotics, money from drug sales, or weapons.  Barnes also argued that he had young children, had started a car-detailing business, and was less culpable than other codefendants.

Following a response by the government, the district court sentenced Barnes to 151 months' imprisonment (the low end of his guidelines range) on Count 1 and 96 months on Count 2, to be served concurrently.[13]  The district court noted that it had considered the statements of the parties, the Sentencing Guidelines, and the 18 U.S.C. § 3553(a) factors.

## VII.  MOTIONS TO SUPPRESS

In reviewing the district court's denial of a motion to suppress, we review the court's findings of fact for clear error and its application of law to those facts de novo.  United States v. Yeary, 740 F.3d 569, 579 n.25 (11th Cir. 2014).  We construe all facts in the light most favorable to the party that prevailed in the district court and afford substantial deference to a factfinder's credibility determinations.  United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012).  We accept the factfinder's choice of whom to believe "unless it is contrary to the laws

---

[13]At sentencing, defendants Barbary and Lewis both received downward variances from the applicable advisory guidelines range and received total sentences of 240 months and 90 months, respectively.  Defendant Barbary's advisory guidelines range was life imprisonment.  Defendant Lewis's advisory guidelines range was 121 to 151 months' imprisonment.

of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (internal quotation marks omitted). Thus, we defer to the district court's factual determinations unless the district court's understanding of the facts is "unbelievable." Id. (internal quotation marks omitted).

## A.    Holt's Motions to Suppress Currency Evidence

On appeal, defendants Holt, Barbary, and Lewis argue that the district court erred in denying Holt's motion to suppress the currency seized during the 2007 and 2010 traffic stops because the police officers unreasonably prolonged the stops for longer than necessary to effectuate the purpose of the stops. They contend that, during both traffic stops, the police officer extended the stop to allow time for the canine unit to arrive.

The Fourth Amendment protects individuals from unreasonable search and seizure. A routine traffic stop is a limited form of seizure that is more analogous to an investigative detention than a custodial arrest, and so we analyze the legality of such stops under the standard articulated in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968). United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). "Under Terry, an officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." Id. (internal quotation marks omitted).

33

Moreover, "the <u>duration</u> of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." <u>Id.</u> (internal quotation marks omitted). Generally, a traffic stop may not last any longer than necessary to process the traffic violation. <u>Id.</u> However, "[a]n officer may . . . prolong a traffic stop in special circumstances." <u>United States v. Boyce</u>, 351 F.3d 1102, 1106 (11th Cir. 2003).

In particular, an officer may prolong a traffic stop to investigate the driver's license and the vehicle registration, including by requesting a computer check, or while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation. <u>Id.</u> However, such activities must not prolong the traffic stop beyond a reasonable amount of time under the circumstances of the stop. <u>See</u> <u>Purcell</u>, 236 F.3d at 1279. Although we measure the reasonableness of a stop's duration under the totality of the circumstances, such that "[r]igid time limitations and bright-line rules are generally inappropriate," we have approved traffic stops lasting, for example, 14 minutes and 50 minutes. <u>Id.</u> (collecting cases).

Additionally, an officer may prolong a traffic stop if he has "articulable suspicion of other illegal activity." <u>Id.</u> at 1277. Once an officer develops reasonable suspicion, he has a duty to investigate more. <u>United States v.</u> <u>Hernandez</u>, 418 F.3d 1206, 1211 (11th Cir. 2005). "A variety of factors may

34

contribute to the formation of an objectively reasonable suspicion of illegal activity," including "inconsistent statements about destination," United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999), and "shaking and acting extremely nervous." United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (internal quotation marks omitted).

As to the use of drug dogs during traffic stops, the Supreme Court has held that "the use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view— during a lawful traffic stop, generally does not implicate legitimate privacy interests." Illinois v. Caballes, 543 U.S. 405, 409, 125 S. Ct. 834, 838 (2005) (internal quotation marks and citation omitted). Thus, during the course of a lawful traffic stop, an officer does not need any level of suspicion of criminal activity either to request a canine unit or to conduct a canine sniff. See United States v. Steed, 548 F.3d 961, 974-75 n.10 (11th Cir. 2008).

Here, we find no error in the district court's denial of Holt's motions to suppress evidence seized during the June 2007 and January 2010 traffic stops. The record clearly supports the district court's findings that, prior to the arrival of the canine units, neither traffic stop exceeded an ordinary traffic stop in duration or

35

scope. See Purcell, 236 F.3d at 1277-80.[14]  In particular, we cannot say as to either stop that an unreasonable length of time elapsed before the deployment of the drug dog—27 minutes in the June 2007 traffic stop, and only a few minutes in the January 2010 stop.  See id. at 1279.  Moreover, uncontroverted testimony established that the canine units arrived while the officers still were conducting routine records checks and preparing the traffic citations.  Therefore, the use of the canines to sniff the exterior of the vehicles during the course of lawful traffic stops did not offend the Fourth Amendment.  See Steed, 548 F.3d at 974-75 n.10.

In addition, as the district court found, Deputy Fernandez and Detective Kirkby had reasonable, articulable suspicions that Holt was engaging in the illegal transportation of narcotics or currency by the time the canine units arrived.  Specifically, as to the June 2007 traffic stop, Deputy Fernandez credibly testified that, prior to the arrival of the canine unit, Holt was nervous, breathing heavily, had to catch his breath, was sweating profusely, failed to maintain eye contact, and had shaking hands; that Holt did not answer his questions concerning where Holt was coming from and going to; that he recognized Holt from his time working in a

---

[14]We note as a preliminary matter that it is unclear whether Holt even had standing to challenge the January 2010 search of the vehicle that he did not own. See United States v. Lee, 586 F.3d 859, 864-65 (11th Cir. 2009) ("We have held that a passenger in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." (quotation and alteration omitted)).  In any event, we need not decide this issue because we find no error in the district court's other grounds for denying Holt's motion to suppress this search.

narcotics unit; and that Holt was pacing, opening and closing his fist, and agitated while waiting for Deputy Fernandez to complete the traffic stop paperwork.

As to the January 2010 traffic stop, Detective Kirkby credibly testified that, before the arrival of the canine unit, neither Holt nor his passenger, Mitchell, made eye contact; Holt's hands were shaking; Holt whispered something to Mitchell before exiting the SUV; Holt offered only short, vague answers to Detective Kirkby's questions; and Holt and Mitchell provided inconsistent statements about their recent travel.  Therefore, as to each traffic stop, when the officer developed reasonable, articulable suspicion of other illegal activity, he permissibly could, and indeed had a duty to, investigate further.  See Hernandez, 418 F.3d at 1211; Purcell, 236 F.3d at 1279-80.

## B.    Barbary's and Lewis's Motions to Suppress Wiretap Evidence

On appeal, defendants Barbary and Lewis contend that the district court should have granted their motion to suppress wiretap evidence because the government failed to demonstrate "necessity" for the wiretap under the federal wiretapping statutes.  We conclude, however, that Barbary and Lewis waived the right to challenge the denial of this motion to suppress, as they failed to object to

the magistrate's R&R recommending denial of the motion to suppress.  See United States v. Schultz, 565 F.3d 1353, 1360-62 (11th Cir. 2009).[15]

## C.    Lewis's Motion to Suppress Evidence from GPS Tracker

Defendants Barbary and Lewis next argue that the district court should have granted Lewis's motion to suppress evidence obtained via the warrantless installation of a GPS tracker on her car for 8 days.  As the government points out, this argument is foreclosed by recent circuit precedent in United States v. Smith, 741 F.3d 1211 (11th Cir. 2013), cert. denied, No. 13-10424, 2014 WL 2558149 (U.S. Dec. 1, 2014), and United States v. Ransfer, 749 F.3d 914 (11th Cir. 2014).

As background, in United States v. Michael, the former Fifth Circuit held that the installation of an electronic tracking device on a vehicle parked in a public place and tracking of the vehicle's movements on public roads did not violate the Fourth Amendment when officers had reasonable suspicion to initiate surveillance of the vehicle.  645 F.2d 252, 258 (5th Cir. 1981) ("Monitoring the beeper while the agents had reasonable suspicion to believe Michael was conspiring to manufacture MDA did not violate his fourth amendment rights.").[16]

---

[15]Even assuming that Barbary and Lewis did not waive the issue, we conclude, after briefing and oral argument, that the district court did not err in denying the motion to suppress wiretap evidence.

[16]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Later, in United States v. Jones, 565 U.S. __, 132 S. Ct. 945 (2012)—

decided after the officers' 2011 installation of a GPS tracker on Lewis's car in this

case—the Supreme Court held that installing a GPS tracker on a vehicle and

tracking the vehicle's movement for 28 days was a search under the Fourth

Amendment. Id. at __, 132 S. Ct. at 949. Although the Supreme Court concluded

that such GPS searches implicate the Fourth Amendment, it had "no occasion to

consider" whether a warrantless GPS search might ever be reasonable. Id. at __,

132 S. Ct. at 954.

Subsequently, in Smith, Defendant Erick Smith argued under Jones that the

district court erred in denying his motion to suppress evidence seized from his

home pursuant to a warrant that was partially supported by information obtained,

pre-Jones, from warrantless GPS surveillance. 741 F.3d at 1215, 1219-20. The

officers in Smith's case twice had conducted warrantless searches that, under

Jones, implicated Fourth Amendment interests when they installed GPS trackers on

Smith's vehicles. Id. at 1221. Nevertheless, this Court held that, even if Jones

would have rendered the warrantless searches unreasonable, the officers' good-

faith reliance upon Michael rendered exclusion inappropriate because, at the time

of the GPS searches, Michael was binding precedent that clearly dictated the

constitutionality of warrantless GPS surveillance. Id.; see also United States v.

Ransfer, 749 F.3d 914, 921-25 (11th Cir. 2014) (holding that a police officer's pre-

Jones, 2011 warrantless placement of a GPS tracker on a car supported by reasonable suspicion was justified based on a good-faith reliance on Michael).

In this case, prior to the Supreme Court's 2012 Jones decision and in reasonable reliance upon this Court's Michael decision, the officers installed the GPS tracker on Lewis's car when they had at least reasonable suspicion to believe that she was engaged in criminal activity. Specifically, multiple intercepted phone calls and text messages between Barbary and Lewis, prior to the installation of the GPS tracker on Lewis's car, led federal agents to believe that Lewis was conspiring with Barbary to further the goals of a drug-trafficking organization. Indeed, Lewis and Barbary do not argue that the officers lacked reasonable suspicion to install the GPS tracker. Accordingly, we conclude based on Smith and Ransfer that, even if Jones rendered the warrantless GPS search unreasonable here, the district court properly applied the good-faith exception to the exclusionary rule and did not err in denying Lewis's motion to suppress.

## VIII.  SUFFICIENCY OF THE EVIDENCE

We review de novo whether sufficient evidence supports a jury's verdict in a criminal trial, taking the evidence in the light most favorable to the government. United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009). Therefore, we resolve any conflicts in favor of the government, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all

40

credibility choices in support of the verdict.  Id.  "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  Id. (internal quotation marks omitted).  The defendant, in rebutting the government's evidence, may not simply put forth a reasonable hypothesis of innocence, as the issue is not whether a jury reasonably could have acquitted but whether it reasonably could not have found guilt beyond a reasonable doubt.  Id.

For a conviction of conspiracy to distribute drugs in violation of 21 U.S.C. § 846, the government must present evidence to prove the following elements beyond a reasonable doubt: "(1) a conspiracy (or agreement) existed between Defendants or between Defendants and others; (2) Defendants knew the essential objects of the conspiracy, which are to do either an unlawful act or a lawful act by unlawful means; and (3) Defendants knowingly and voluntarily participated in the conspiracy."  United States v. Westry, 524 F.3d 1198, 1212 (11th Cir. 2008).  We have explained that "because a conspiracy is predominantly mental in composition, circumstantial evidence is frequently resorted to in order to prove its elements."  Id. (internal quotation marks omitted).  The trier of fact may infer a conspiracy from a "concert of action."  Id. (internal quotation marks omitted).

41

## A.    Barnes's Motion for Judgment of Acquittal

Defendant Barnes argues that insufficient evidence supported his convictions because the only evidence presented against him was wiretapped telephone calls between himself and Barbary that were devoid of the words "cocaine," "Oxycodone," "drugs," or any related code words.

We disagree.  Viewing the evidence in the light most favorable to the government, a jury reasonably could have found Barnes guilty of conspiring to distribute and possess with intent to distribute oxycodone and between 500 and 5,000 grams of cocaine and conspiring to use a communication facility to facilitate a narcotics crime.  In multiple recorded phone calls with Barbary, Barnes used veiled language that a jury reasonably could infer referred to distributing cocaine and searching for sources to obtain oxycodone.

While Barnes attempts to minimize the intercepted phone calls, the incriminating content and frequency of the phone calls between Barnes and Barbary provided strong evidence of Barnes's guilt.  Specifically, the jury heard recordings of more than 15 intercepted phone calls between Barnes and Barbary—which occurred over the course of just a few months—that involved discussions that the jurors could reasonably find related to the procurement and distribution of cocaine and oxycodone.

For example, in some of these phone calls, Barnes referenced "serv[ing] a lil bit" multiple times, complained that he was "losing" his "customers," and indicated that he had money for Barbary. Barnes also gave repeated updates to Barbary concerning his drug sales, such as stating that he had "three left" or was "working on the last one." And Barnes used multiple words that a jury reasonably could infer were code words for particular drugs, including calling cocaine "the regular." Finally, as to cocaine quantity, in an intercepted call in which Barnes and Barbary discussed the price for an unspecified substance supplied by Barnes's "cousin," Barnes used language that a jury reasonably could infer referred to 1,000 grams (i.e., one kilogram) of cocaine. Specifically, Barnes and Barbary discussed the price of "29" or "30," which Agent Sargent testified likely referred to the price of a kilogram of cocaine, $29,000 or $30,000.

## B.    Hartfield's Motion for Judgment of Acquittal

Defendant Hartfield contends that his conviction was not supported by sufficient evidence because, although the government proved that he possessed oxycodone, it did not prove that he was part of a conspiracy to distribute oxycodone. Specifically, the government introduced no direct evidence that Hartfield reached any agreement with Barbary and presented simply circumstantial evidence that could show a link between Barbary and Hartfield only through speculation.

43

We conclude that sufficient evidence supported Hartfield's conviction of conspiracy to distribute and possess with intent to distribute oxycodone. The government presented ample evidence from which a jury reasonably could infer that Hartfield had entered a conspiracy with Barbary and others to transport and distribute oxycodone. Travel records, and Hartfield's own admissions upon his arrest, showed that he made multiple trips transporting oxycodone from Florida to Boston. And a jury reasonably could infer that Barbary paid for Hartfield's trips based on the evidence that the Netspend card used to purchase Hartfield's train tickets had Barbary's mailing address and email address associated with it, was used both before and during Hartfield's incarceration to book trips through Barbary's Expedia account, and was found on Barbary's person upon his arrest.

Moreover, as further evidence of Barbary's connection to Hartfield's trips to Boston, the government's evidence showed that, after Hartfield's arrest, Barbary arranged for Carswell to transport money from Boston to Florida. And then, after money was seized from Carswell at the Boston airport, the record suggests that Hartfield and Barbary's point of contact in Boston attempted to mail money to Barbary.[17]

---

[17]As a final matter, defendant Barbary purports to adopt the sufficiency-of-the-evidence arguments raised by Barnes and Hartfield, and defendant Lewis adopted Barbary's arguments. However, we have held that "sufficiency arguments are too individualized to be generally adopted." United States v. Cooper, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (quotation and alterations omitted). Accordingly, we decline to consider the sufficiency of the evidence as to Barbary's and Lewis's convictions. In any event, as our earlier summary of the trial evidence

## IX.  CONSTRUCTIVE AMENDMENT AND VARIANCE

The Fifth Amendment guarantees that a defendant can be convicted only of crimes charged in the indictment.  United States v. Ward, 486 F.3d 1212, 1226 (11th Cir. 2007).  Thus, when the evidence at trial or the court's jury instructions deviate from what is alleged in the indictment, either a constructive amendment or a variance can arise.  United States v. Flynt, 15 F.3d 1002, 1005 (11th Cir. 1994).

A constructive amendment occurs "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment."  United States v. Narog, 372 F.3d 1243, 1247 (11th Cir. 2004) (internal quotation marks omitted).  The indictment can be expanded, either literally or in effect, by the prosecutor's actions or the district court's instructions.  United States v. Behety, 32 F.3d 503, 508-09 (11th Cir. 1994).  A constructive amendment "is per se reversible error."  Narog, 372 F.3d at 1247.  However, we have held that evidence that properly was admitted as intrinsic to the charged offenses does not impermissibly broaden the indictment to include other crimes.  United States v. Lehder-Rivas, 955 F.2d 1510, 1519 n.5 (11th Cir. 1992).

---

makes clear, the government presented overwhelming evidence against defendants Barbary and Lewis.

On the other hand, a "variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." Narog, 372 F.3d at 1247 (internal quotation marks omitted). The allegations in the indictment and proof at trial must correspond so that the defendant is properly notified of the charges, enabling him to present a defense, and is protected against a subsequent prosecution for the same offense. United States v. Reed, 887 F.2d 1398, 1403 (11th Cir. 1989). Unlike a constructive amendment, a variance requires reversal only when the defendant can establish that his rights were substantially prejudiced. Narog, 372 F.3d at 1247.

## A.    Barbary's Constructive Amendment Claim

Defendant Barbary argues that the district court erred in admitting Bennett's testimony that Barbary and Bennett sold crack cocaine, powder cocaine, and heroin together in 1995 because the testimony resulted in a constructive amendment of the indictment, which alleged a drug conspiracy from 2000 to 2010 involving just cocaine and oxycodone.

While we ordinarily review a constitutional issue de novo, United States v. Williams, 527 F.3d 1235, 1239 (11th Cir. 2008), we review an unpreserved constructive-amendment claim only for plain error. United States v. Madden, 733 F.3d 1314, 1322-23 (11th Cir. 2013); United States v. Dortch, 696 F.3d 1104, 1112

46

(11th Cir. 2012).[18]  Under the plain-error standard, we will not correct an error raised for the first time on appeal unless there is an error that is plain; that affects substantial rights; and that "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Madden, 733 F.3d at 1322.[19]

Barbary's constructive amendment argument is misplaced.  Although an indictment may be constructively amended by presenting irrelevant evidence of uncharged offenses, there are many instances in which evidence of uncharged offenses is properly admitted in a criminal trial.  Relevant here, evidence of uncharged offenses that are intrinsic to the charged conduct is admissible if (1) the uncharged offense arose out of the same transaction or series of transactions as the charged offense, (2) the evidence is necessary to complete the story of the crime, or (3) the evidence is inextricably intertwined with the evidence regarding the charged offense.  United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998).  This Court has explained that "[e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the

---

[18]At trial, Barnes—but not Barbary—objected to Bennett's testimony concerning Bennett's 1995 drug sales with Barbary, stating, "Judge, I am going to object.  This is 1995.  It is outside the scope of the indictment."  Even assuming that an objection by a codefendant would be sufficient to preserve this issue on appeal for Barbary, this general objection was insufficient to raise the constructive-amendment argument that Barbary now makes on appeal.  See United States v. Deverso, 518 F.3d 1250, 1255 (11th Cir. 2008).

[19]In Madden, the Court noted that the defendant "cite[d] five cases for the proposition that a constructive amendment is a per se reversible error," but the Court concluded that those cases did not alter its conclusion that traditional plain-error review applied because those cases involved defendants who objected to the district court's constructive amendment.  Madden, 733 F.3d at 1321-22 & n.5.

47

crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." Id.

In this case, Bennett's testimony concerning the 1995 drug dealings was necessary for the government to complete the story of the charged crimes, as it explained how Bennett came to know and participate in narcotics distribution with Barbary and Barbary-Jackson and why he helped them distribute drugs after his release from prison in 2000. This type of properly admitted intrinsic evidence did not broaden the possible bases for a conviction, and thus, did not constructively amend the indictment. See Lehder-Rivas, 955 F.2d at 1519 n.5. Because the evidence was properly admissible, its admission—and the government's reliance on it to support its case—did not cause a constructive amendment of the indictment, and there was no error, much less plain error.

## B.    Holt, Barnes, and Hartfield's Variance Claim

Defendants Holt, Barnes, and Hartfield argue that a material variance occurred in this case because, while the indictment alleged a single conspiracy, the evidence at trial showed multiple distinct conspiracies. They suggest that the evidence demonstrated a rimless hub-and-spoke conspiracy, with Barbary as the "hub" with multiple "spokes."

"A material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." United States v. Alred, 144 F.3d 1405, 1414 (11th Cir. 1998) (internal quotation marks omitted). The issue of whether the evidence establishes a single conspiracy is a question of fact for the jury. Id. Accordingly, "the arguable existence of multiple conspiracies does not constitute a material variance from the indictment if, viewing the evidence in the light most favorable to the government, a reasonable trier of fact could have found that a single conspiracy existed beyond a reasonable doubt." Id.[20] We therefore will not disturb the jury's determination that a single conspiracy exists if supported by substantial evidence. Id. In determining whether a jury reasonably could have found a single conspiracy, we consider "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." Id. (internal quotation marks omitted).

As to the common-goal factor, we typically define the common goal element as broadly as possible and repeatedly have explained that "common" means "similar" or "substantially the same" rather than "shared" or "coordinate." United States v. Richardson, 532 F.3d 1279, 1285 (11th Cir. 2008) (internal quotation

---

[20]Only Barnes, and not Holt and Hartfield, raise this "multiple conspiracies" argument in the district court, so we review Holt and Hartfield's material variance claim for plain error. See United States v. Straub, 508 F.3d 1003, 1010-11 (11th Cir. 2007). In any event, we find no error, plain or otherwise.

marks omitted).  "[I]n a drug conspiracy, in which the object of the conspiracy is clearly illegal and there are various clandestine functions to perform, the conspirators can be charged with knowledge that others are performing these different functions."  Id. (internal quotation marks omitted).  Although it is often possible to divide a single drug conspiracy into sub-agreements, this does not necessarily mean that more than one conspiracy exists.  Id.  Rather, "[t]he key is to determine whether the different sub-groups are acting in furtherance of one overarching plan."  Id. (internal quotation marks omitted).

In a so-called "hub-and-spoke conspiracy," "a central core of conspirators . . . recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise."  United States v. Pacchioli, 718 F.3d 1294, 1303 (11th Cir.) cert. denied, 134 S. Ct. 804 (2013) (internal quotation marks omitted).  "Where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes."  Id. (internal quotation marks and alteration omitted).  However, although "particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy," the government need only prove "an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators."  Richardson, 532 F.3d at 1284 (internal quotation marks omitted).  Moreover, "[i]f

a defendant's actions facilitated the endeavors of other co-conspirators, or

facilitated the venture as a whole, a single conspiracy is established." Id.  We have

held that "a jury may find that a single conspiracy existed when a 'key man' directs

and coordinates the activities and individual efforts of various combinations of

people." Id. (internal quotation marks omitted).

As a final matter, unless a variance is material and substantially prejudiced

the defendants, we will not reverse the defendants' convictions because a single

conspiracy is charged in the indictment but multiple conspiracies were revealed at

trial.  Alred, 144 F.3d at 1414.  To demonstrate substantial prejudice, a defendant

must show (1) "that the proof at trial differed so greatly from the charges that [he]

was unfairly surprised and was unable to prepare an adequate defense"; or (2) "that

there are so many defendants and separate conspiracies before the jury that there is

a substantial likelihood that the jury transferred proof of one conspiracy to a

defendant involved in another." United States v. Calderon, 127 F.3d 1314, 1328

(11th Cir. 1997), modified on other grounds by United States v. Toler, 144 F.3d

1423, 1426-28 (11th Cir. 1998).  As to whether a jury transferred proof of one

conspiracy to a defendant involved in another, we have found no substantial

prejudice where the jury returned different verdicts on different counts as to

different defendants, such that the "divergent verdicts indicate[d that] the jury . . .

had no difficulty compartmentalizing the evidence presented." United States v. Glinton, 154 F.3d 1245, 1252 (11th Cir. 1998).

Here, we conclude that, viewing the evidence in the light most favorable to the government, the jury in this case reasonably could have found that a single conspiracy existed beyond a reasonable doubt. See Alred, 144 F.3d at 1414. First, the evidence at trial that we describe above was sufficient to support the conclusion that Barbary and his various confederates, including Holt, Barnes, and Hartfield, operated toward a common goal to distribute cocaine and oxycodone in South Florida and Boston. Even assuming that Holt, Barnes, and Hartfield did not know every co-conspirator or participate in every stage of the conspiracy, the jury reasonably could have inferred that these defendants intentionally joined in the conspiracy's common goal and that Barbary, as a "key man," directed, coordinated, and facilitated the venture as a whole. See Richardson, 532 F.3d at 1285-86.

Second, the jury reasonably could have found the existence of an underlying scheme. In particular, the evidence supported a reasonable conclusion that the nature of the scheme was that Barbary, with Holt's assistance, distributed drugs to Barnes, Hartfield, and others for them to distribute in turn to others. Finally, the evidence demonstrated a significant overlap of participants. For example, Holt knew and interacted with Barbary, Lewis, Jackson, Lespinasse, and Bennett;

52

Barnes had direct connections with Barbary and Holt; and Hartfield had direct connections with Barbary, Holt, and Bennett.  Therefore, because the government presented evidence sufficient to establish a common goal, underlying scheme, and overlap of participants, there was no material variance, and we will not disturb the jury's verdict.  See Alred, 144 F.3d at 1414.

Nevertheless, even if the jury could not have found a single conspiracy, such that a material variance occurred, we conclude that Barnes, Holt, and Hartfield have not demonstrated any substantial prejudice.  See id. at 1415-16.  As to the first way substantial prejudice may be shown, the defendants make no argument that the proof at trial differed so greatly from the charges that they were unfairly surprised and were unable to prepare an adequate defense.  See Calderon, 127 F.3d at 1328.

Moreover, as to the second way in which substantial prejudice may be shown, we reject the defendants' argument that there were so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another.  See id. In particular, we note that the jury returned different verdicts as to different defendants, indicating that the jurors were able to compartmentalize the evidence presented.  See Glinton, 154 F.3d at 1252.  Specifically, the jury found the defendants responsible for different combinations and quantities of drugs, and

53

acquitted Hartfield of conspiracy to use a communication facility to facilitate a narcotics crime.

## X.  EVIDENTIARY ISSUES

### A.    Agent Sargent's Testimony

On appeal, defendants Holt, Barnes, Lewis, and Barbary argue that the district court abused its discretion in admitting Agent Sargent's expert testimony concerning drug code words and jargon as used in their intercepted phone calls.

We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion.  United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc).  We will not reverse a district court's evidentiary ruling in the absence of manifest error.  Id.  As we have explained, "a district court enjoys considerable leeway" in its evidentiary rulings.  Id.

Federal Rule of Evidence 702, which controls the admission of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

We have observed that, as the Supreme Court made clear in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), Rule 702 requires district courts to serve an important gatekeeping function concerning the admissibility of expert scientific evidence and technical expert evidence.  Frazier, 387 F.3d at 1260.  Thus, district courts must engage in a three-part inquiry in determining the admissibility of expert testimony under Rule 702, considering whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).

"The operations of narcotics dealers are a proper subject for expert testimony under Rule 702," and "an experienced narcotics agent may testify as an expert to help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business."  United States v. Garcia, 447

F.3d 1327, 1335 (11th Cir. 2006) (internal quotation marks omitted).  We have affirmed the admission of expert testimony by law enforcement officers interpreting drug codes and jargon.  See, e.g., United States v. Emmanuel, 565 F.3d 1324, 1335-36 (11th Cir. 2009); United States v. Brown, 872 F.2d 385, 392 (11th Cir. 1989).

We cannot say that the district court erred, much less manifestly erred, in admitting Agent Sargent as an expert witness and permitting her to testify as to the meanings of coded language used by the defendants in intercepted communications.  See Frazier, 387 F.3d at 1258.  First, as the district court found, Agent Sargent was qualified to testify competently regarding the coded language.  See id. at 1260-61.  Agent Sargent was qualified based on, most notably, her extensive involvement in this particular investigation, including review of more than 99 percent of the intercepted communications in this case, as well as her training, experience in previous wiretaps, and general investigative experience during her six years as a DEA Agent.

Second, Agent Sargent explained the reliable methods by which she reached her conclusions.  Specifically, she formed her opinions as to the defendants' use of certain terminology in the intercepted phone calls based on her training, experience, discussions with cooperating co-conspirators, general knowledge of

common drug prices and quantities, review of nearly all of the communications in this case, and the context of each particular communication.

Third, Agent Sargent's testimony assisted the jury to understand the intercepted phone calls because her testimony, if accepted by the jury, helped the jurors understand the meaning of the defendants' coded language. Contrary to the defendants' suggestion that Agent Sargent admitted that her testimony would not assist the jury, Agent Sargent testified that, although a lay person might be able to guess the meanings of code words used in the intercepted communications, she could—based on her training and experience—interpret the meaning of the words more accurately than a lay person or the prosecutor.

As a final matter, the record does not support the defendants' contention that allowing Agent Sargent to testify as an expert permitted her to invade the province of the jury and give her opinion as to the defendants' ultimate guilt. The record shows that Agent Sargent's testimony largely was focused on specific words and language used in the intercepted communications, and does not show that she offered overall conclusions as to the defendants' guilt or acted as a summary prosecution witness.

## B.    Rule 404(b) Evidence of Barnes's Prior Drug Convictions

Defendants Barnes, Barbary, and Lewis contend that the district court erred in admitting evidence of Barnes's 2002 felony drug convictions pursuant to Rule

57

404(b).  Barnes claims that, because there was a "lack of any real substantive evidence" against him, the Rule 404(b) evidence essentially served as a substitute for substantive evidence and allowed the jury to convict him based on a propensity to deal in cocaine.

We review for an abuse of discretion a district court's admission of evidence of a defendant's prior bad acts under Rule 404(b).  United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003).  Rule 404(b) provides:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.  . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Fed. R. Evid. 404(b).  We use a three-part test to determine whether other bad acts are admissible under Rule 404(b): (1) "the evidence must be relevant to an issue other than the defendant's character"; (2) "the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act"; and (3) "the probative value of the evidence must not be substantially outweighed by its undue prejudice."  United States v. McNair, 605 F.3d 1152, 1203 (11th Cir. 2010) (internal quotation marks omitted).

"There is ample precedent in this circuit finding that a not guilty plea in a drug conspiracy case makes intent a material issue and opens the door to admission of prior drug-related offenses as highly probative, and not overly prejudicial,

58

evidence of a defendant's intent." Smith, 741 F.3d at 1225 (internal quotation marks omitted and alterations omitted).  We have affirmed such Rule 404(b) evidence "even where the prior conviction is many years old."  Id.

We find no abuse of discretion in the district court's admission of evidence of Barnes's 2002 felony drug convictions.  Barnes's prior convictions for possession of cocaine with intent to deliver and trafficking in cocaine both occurred during the timeframe of the conspiracy alleged in the present case and involved the same drug—cocaine—as the present conspiracy.  By pleading not guilty in this case, Barnes opened the door to the admission of prior drug-related offenses as highly probative, and not overly prejudicial, evidence of his intent.  See id.  Moreover, contrary to Barnes's suggestion that the jury convicted him based on a propensity to deal in cocaine because there was a "lack of any real substantive evidence" against him, the numerous intercepted phone calls between Barnes and Barbary in which they discussed procuring and distributing cocaine and oxycodone overwhelmingly supported his convictions.

## C.    Bennett's Hearsay Testimony

On appeal, defendant Lewis and Barbary argue that the district court erred in admitting hearsay testimony by Bennett that Barbary told him that Lewis "was across the street," which Bennett took to mean that Lewis was on the west coast of Florida delivering drugs.  Lewis and Barbary contend that no explanation was

59

offered as to how this statement was made in furtherance of the conspiracy and that "the time span of the Indictment was after Bennett was in prison, so there was no possible way the statement could have been made during that time."[21]

District courts have the discretion to admit co-conspirator statements made during and in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E). United States v. Siegelman, 640 F.3d 1159, 1180 (11th Cir. 2011). We apply a liberal standard in determining whether a statement was in furtherance of a conspiracy. Id. at 1181. The statement needs only to have furthered the interests of the conspiracy in some way. Id. For example, "if the statement could have been intended to affect future dealings between the parties, then the statement is in furtherance of a conspiracy." Id. (internal quotation marks and alteration omitted). Additionally, a statement that was necessary to keep a co-conspirator abreast of the conspiracy's current status is in furtherance of the conspiracy. United States v. Monroe, 866 F.2d 1357, 1363 (11th Cir. 1989). Finally, we have held that "statements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy." Siegelman, 640 F.3d 1181 (internal quotation marks and alterations omitted).

---

[21]Because no defendant contemporaneously objected to the testimony at issue, we review for plain error. See United States v. Turner, 474 F.3d 1265, 1271-72, 1275 (11th Cir. 2007).

We find no plain error in the district court's admission of Bennett's testimony under Rule 801(d)(2)(E). Viewing the statement liberally, Barbary's statement to Bennett that Lewis "was across the street" furthered the interests of the conspiracy. See id. This statement, which Bennett understood to mean that Lewis was on the west coast of Florida delivering drugs, served to keep Bennett abreast of the conspiracy's status and to maintain trust and cohesiveness between Bennett and Barbary and the other conspirators. See id.; see also Monroe, 866 F.2d at 1363. The record belies Lewis's claim that Barbary could not have made this statement to Lewis during the timeframe alleged in the indictment because of Bennett's incarceration, as testimony established that Bennett was not incarcerated from 2000 to 2011. In any event, even if we assume that plain error occurred, Lewis and Barbary have offered no argument that their substantial rights were affected or that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. See Dortch, 696 F.3d at 1112.

## XI.  MOTION FOR RECESS

Defendants Lewis and Barbary argue that the district court abused its discretion in refusing to grant Lewis an overnight recess to prepare herself and her witnesses to testify.

We review a district court's decision declining to recess a trial for an abuse of discretion. United States v. Russell, 717 F.2d 518, 520 (11th Cir. 1983). The

61

district court has broad discretion in the management of a trial, and we will not reverse absent a clear showing of abuse.  United States v. Hilliard, 752 F.2d 578, 582 (11th Cir. 1985).  "The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. . . . If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings."  Geders v. United States, 425 U.S. 80, 86-87, 96 S. Ct. 1330, 1334-35 (1976).

A criminal defendant has the right to testify on her own behalf.  United States v. Byrd, 403 F.3d 1278, 1282 (11th Cir. 2005) (citing Rock v. Arkansas, 483 U.S. 44, 49, 107 S. Ct. 2704, 2708 (1987)).  However, this right is not without limitation and must sometimes bow to accommodate other legitimate interests in the criminal trial process.  Id.  "[R]estrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve."  Rock, 483 U.S. at 55-56, 107 S. Ct. at 2711.

We cannot say that the district court abused its discretion in denying Lewis's motion for a recess to prepare to testify and obtain witnesses.  The district court reasonably found that, at the time that Lewis requested a recess for additional time to prepare to testify, the trial had been going on for weeks, Lewis had received multiple warnings to be ready to present her case, and she already had the opportunity to discuss whether to testify with her attorney.  Under these

circumstances, it was not an abuse of discretion for the district court to decline Lewis's request for additional time to prepare to testify.

As to Lewis's request for a recess to obtain the testimony of absent witnesses, in determining whether a district court abused its discretion in denying such a request we consider: "(1) the diligence of the defense in interviewing the witness and procuring her testimony; (2) the probability of obtaining the testimony within a reasonable time; (3) the specificity with which the defense was able to describe the witness's expected knowledge or testimony; and (4) the degree to which such testimony was expected to be favorable to the accused, and the unique or cumulative nature of the testimony." United States v. Alejandro, 118 F.3d 1518, 1523 (11th Cir. 1997).

Here, the Alejandro factors clearly militate in favor of the district court's decision denying Lewis's request. First, Lewis indicated that she had not timely subpoenaed witnesses, showing a lack of diligence. Second, Lewis did not state that the witnesses would in fact testify if a recess were granted. Third, Lewis's attorney did not offer much detail as to the expected testimony. And, finally, the expected testimony from the witnesses as proffered by Lewis's counsel was not significantly favorable because, even assuming Lewis's involvement in a legitimate trucking business, overwhelming evidence presented by the government showed that she was also part of an illegal narcotics-distribution conspiracy. Thus,

we conclude that the district court did not abuse its discretion in denying Lewis's request for additional time to obtain absent witnesses.

## XII.  CUMULATIVE ERROR

The final argument raised by defendants Holt, Barbary, Barnes, and Lewis concerning their convictions is that cumulative error by the district court requires reversal.  Holt, Barbary, Barnes, and Lewis have not established a single error, however, let alone the aggregation of "many errors" that may require a reversal where the individual errors do not.  See United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005).  Accordingly, we reject their cumulative error claim.

## XIII.  SENTENCING ISSUE

Defendant Barnes argues that his 151-month sentence was substantively unreasonable sentence because the record reflected his minor role in the drug conspiracy, he had not been in trouble with the law in nearly a decade, he was trying to start his own business, and he was less culpable than Barbary and Lewis, who received downward variances.

We review the reasonableness of a sentence for abuse of discretion.  United States v. Cubero, 754 F.3d 888, 892 (11th Cir. 2014), cert. denied, No. 14-6921, 2014 WL 5502425 (U.S. Dec. 8, 2014).  We consider whether a sentence is substantively unreasonable under the totality of the circumstances and in light of the 18 U.S.C. § 3553(a) factors.  Id.

64

In determining a sentence, a district court must evaluate all of the § 3553(a) factors but can attach "great weight" to one factor over others.[22] Id.  The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court.  United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007).  As to variances, we have recognized that a "district court has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate."  Cubero, 754 F.3d at 892 (internal quotation marks and alteration omitted).  "We give that decision due deference because the district court has an institutional advantage in making sentencing determinations."  Id. (internal quotation marks omitted).

The party challenging the reasonableness of a sentence on appeal bears the burden to show that it is unreasonable.  Id. at 893.  "We may vacate a sentence only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  Id. at 892-93 (internal quotation marks omitted).   We have held

---

[22]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

that two indicators of reasonableness are a sentence at the bottom of the advisory guidelines range and a sentence well below the statutory maximum penalty. Id. at 898.

One of the § 3553(a) factors requires the district court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). However, we will not find a sentence disparity among codefendants to be "unwarranted" when they are not similarly situated. United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009).

We conclude that Barnes's total 151-month sentence was reasonable. As an initial matter, this sentence was at the bottom of Barnes's advisory guidelines range and well below the statutory maximum penalty of life imprisonment. See Cubero, 754 F.3d at 898. Moreover, Barnes's contention that his sentence was disproportionate to that of his codefendants Barbary and Lewis, as they received downward variances and he did not, is unavailing because Barnes was not similarly situated to these codefendants. See Docampo, 573 F.3d at 1101. In particular, neither Barbary nor Lewis had any criminal history points, while Barnes stipulated to a criminal history score of III and had multiple prior convictions. Finally, Barnes's arguments regarding his minor role in the conspiracy, the age of his criminal history, and his attempt to make a legitimate living essentially ask this

Court to reweigh the § 3553(a) factors, and this we will not do.  See Clay, 483 F.3d at 743.  In sum, we cannot say that the district court committed a clear error in judgment in declining to grant Barnes a downward variance and imposing a 151-month sentence.

## XIV.  CONCLUSION

For the foregoing reasons, we affirm all of the defendant-appellants' convictions and affirm Barnes's sentences.

**AFFIRMED.**