[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12003
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cr-20300-RNS-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL MUNDAY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 13, 2020)

Before BRANCH, GRANT, and TJOFLAT Circuit Judges.

PER CURIAM:

Michael "Mickey" Munday appeals his convictions and 144-month sentence following a jury trial finding him guilty of mail fraud in violation of 18 U.S.C. § 1341 and conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349 arising from his involvement in a vehicle theft scheme. On direct appeal, he raises two issues. Munday first contends that the district court erred by admitting impermissible character evidence that was unduly prejudicial by allowing testimony that he had formerly been a "smuggler" and the playing of a video depicting him driving a flatbed truck with no connection to the crimes at issue, in violation of Rules 404(a)(1), (b)(1), and 403 of the Federal Rules of Evidence. Munday also contends that the district court's sentence was substantively unreasonable because it exceeded the sentences of his co-conspirators. For the following reasons, we affirm.

## I. Background

In 2017, Munday was one of ten codefendants arrested and indicted on numerous charges arising from their involvement in a vehicle "title-washing" scheme. As part of their criminal enterprise, Munday and his co-conspirators would first procure cars with outstanding liens from around the United States through a variety of nefarious means (*e.g.*, from owners behind on loan payments in exchange for miniscule sums of cash, straw purchases, or actual theft). They would then transport the cars to Florida and hide them to evade lienholders (often

2

banks). Once hidden, they would place "towing and storage liens" on the vehicles, typically for egregiously high sums, and conduct sham auctions which listed the cars as no-title, as-is, and cash-only sales—to ensure no one bid. And then the real trickery came into play. After conducting auctions in which no one bid, the conspirators suddenly owned the cars; they would then clear the titles pursuant to a Florida lien statute permitting tow companies to recover unpaid towing liens. *See* Fla. Stat. § 713.78(6).[1] With clean titles in hand, they would sell the vehicles to a dealer for a profit. In just six years, the conspirators caused *at least* $1.7 million in losses to approximately 30 financial institutions and victimized many individuals who were behind on their car payments. Nine of the ten conspirators pleaded guilty—that is, everyone except for Munday, who went to trial.

---

[1] Although this specific statute was not referenced in any part of the proceedings below or in the briefs on appeal, it appears that the conspirators used § 713.78(6) to cover their crimes. The relevant portion of § 713.78(6) in effect at the time of Munday's arrest provides:

> Any vehicle . . . which is stored [by a person regularly engaged in the businesses of transporting vehicles . . . by wrecker, tow truck, or car carrier,] and which remains unclaimed, or for which reasonable charges for recovery, towing, or storing remain unpaid . . . may be sold by the owner or operator of the storage space for such towing or storage charge . . . . The sale shall be at public sale for cash. . . . [N]otice of the sale shall be given to the person in whose name the vehicle . . . is registered and to all persons claiming a lien on the vehicle . . . . Notice shall be sent by certified mail . . . . The certificate of title issued under this law shall be discharged of all liens . . . .

Fla. Stat. § 713.78(6) (2014).

Twelve days before his trial, the government notified Munday that it intended to introduce recordings of public statements he had made regarding his criminal past pursuant to Rule 404(b).[2]  As it turns out, in 1991, Munday was convicted of charges stemming from a criminal enterprise to import approximately 20,000 pounds of cocaine into the United States.  He was sentenced to 25 years in prison, but was released ahead of schedule in 1999.  Apparently, stories from his previous exploits as a drug smuggler were of interest to some, and in 2006 he agreed to be interviewed on the topic for a documentary, "Cocaine Cowboys." With shots of speed boats and flatbed tow trucks flashing on the screen, Munday provided a detailed play-by-play of his strategies for evading law enforcement while transporting large quantities of cocaine, including how he would utilize tow trucks to remain inconspicuous.[3]  After all, Munday elsewhere explained, police

---

[2] Rule 404(b) provides:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must: provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).

[3] The specific portion of "Cocaine Cowboys" used by the government at trial can be found on YouTube.  *See, e.g.*, Magnolia Pictures, *Cocaine Cowboys: Tow Company* at 00:02:12—00:02:40, YOUTUBE (Dec. 18, 2019), https://bit.ly/38RsV1M.

4

rarely pull over tow trucks, and even when they do the tow-truck driver can believably feign innocence if drugs are found in a vehicle's trunk. With the documentary and other media attention, Munday suddenly found himself enjoying "kind of like a cult-like following," and for the next decade (including while participating in the title-washing scheme) he was regularly interviewed by radio stations and on television.[4] During those interviews, he would sometimes describe himself as a "tow truck driver," retell his inventive use of a tow truck to smuggle cocaine, and claim that "if it flies, rolls, or floats, I was the guy that moved it." He even recorded his own audiobook, "Tall Tales," to memorialize some of his stories as a smuggler, and he advertised that audiobook on Twitter by posting a picture of himself with a tow truck in the background.

The government sought to introduce a number of Munday's recordings and social media posts, claiming that this evidence demonstrated Munday's "intent, knowledge and absence of mistake in the execution of the car title-washing scheme," and also that these statements were "inextricably intertwined" with his participation in the conspiracy. Regarding the latter justification, the government explained that it also intended to offer testimony from the scheme's lead organizer, Mark Johnson (who had agreed to cooperate pursuant to a plea deal), discussing

---

[4] During sentencing, Munday admitted that he had "given over 100 interviews," in addition to "commercials for clothing companies, for hip hop, and rap people."

5

how Munday's reputation as a "Cocaine Cowboy" and his statements about his "prowess as a criminal and a contraband smuggler" were some of the primary reasons he brought Munday into the conspiracy and eventually grew to trust him.

Munday filed a motion *in limine* objecting to the introduction of any evidence of his prior convictions related to smuggling cocaine as unduly prejudicial character witness evidence that does not involve acts of dishonesty or false statements. The district court held a two-day pretrial hearing to entertain both parties' arguments and review the relevant recordings. The government specified the exact video and audio clips it wanted to introduce at trial, including a clip from "Cocaine Cowboys." The video clip at issue shows Munday driving a flatbed truck as he is heard explaining how he previously used such trucks to remain inconspicuous while transporting cocaine. The district court recognized the potential for improper prejudice that accompanied the use of the documentary (and other similar evidence). In seeking to balance that risk with its probative value, the court allowed the documentary to be admitted only if the government agreed to "sanitize" it, that is, to strip it of references to drugs and not use its actual title.

On the day of trial, just before the jury was brought into the courtroom, the government asked the court's permission for its witnesses to testify "that [Munday] discussed smuggling with them and bragged about smuggling and evading law enforcement," and assured the court that this testimony would not include

6

references to Munday being a "cocaine cowboy" or use the phrase "drug smuggling." The court responded approvingly, saying, "I think that was kind of implicit in my previous rulings." And Munday "continue[d] with [his] objection."

Testimony from multiple witnesses at trial established that Munday's main role in this scheme was to help with the transportation of the cars.[5] Johnson's testimony was especially illuminating. He testified that "[Munday] was a person who was able to move things around, he was a logistics guy . . . and he was able to evade law enforcement successfully for—for a good amount of time." In fact, it was this particular skill set that served as the basis for Johnson's decision to bring Munday into the conspiracy. They met in a restaurant in 2011, after Johnson had already begun the title-washing scheme, struck up a conversation about their mutual love of cars, and discussed Munday's criminal past. Specifically, Munday told Johnson about "things that he had done with evading law enforcement . . . and smuggling." Were it not for Munday telling Johnson about these criminal experiences, Johnson testified that he would not have brought Munday into the conspiracy.

During trial, Munday objected to the introduction of the clip from "Cocaine Cowboys" which displayed him driving a flatbed truck. He also objected to that

---

[5] Testimony also established that Munday procured vehicles, stored vehicles on his property, attended sham auctions, signed titles for vehicles, and delivered "washed" titles to buyers.

7

part of Johnson's testimony about meeting Munday, where Munday supposedly described his history of "evading law enforcement . . . and smuggling." Similarly, he objected to the testimony of a federal agent summarizing the "Tall Tales" audiobook as being about Munday's "life previously as a smuggler," and testimony from another co-conspirator stating that Munday once described his past life "smuggling." The court overruled these objections. After four days of trial, the jury found Munday guilty of five counts of mail fraud and one count of conspiracy to commit mail fraud.

Munday then filed a motion for a new trial. He argued that the government's description of him as a "smuggler" was improper character and prior bad act evidence in violation of Rule 404(a)(1) and (b)(1), respectively, and that the government had not given him proper notice about the use of that term in violation of Rule 404(b)(2). He further asserted that the uses of the term "smuggler" and the clip from "Cocaine Cowboys" were unduly prejudicial in violation of Rule 403. The court disagreed, finding that the government's pre-trial notice of intent to offer Rule 404(b) evidence sufficiently alerted Munday to its intention to introduce evidence of his past smuggling experience, and the court's efforts to limit such evidence to items suggesting Munday's "intent and knowledge to conspire and commit mail fraud in the transportation sector" brought that evidence within Rule 404(b)'s exceptions. The court further found that its limiting

8

efforts—which included not allowing the jury to hear the name of the film or otherwise know that Munday has been referred to as a "cocaine cowboy"—avoided any undue prejudice that could have resulted from references to Munday's past "smuggling" and the "Cocaine Cowboy" video clip.  Thus, Munday's motion for a new trial was denied.[6]

The probation officer who prepared Munday's presentence report ("PSI") calculated his total offense level at 32 and his criminal history category at III, resulting in a Guideline range recommendation of 151 to 188 months' imprisonment.  At the sentencing hearing, both the government and Munday stipulated that his criminal history category should be downgraded to a category II due to the fact that his involvement in the title-washing scheme began after his supervised release had ended and so the enhancement for offenses while under any criminal justice sentence did not apply.  The district court accepted that stipulation

---

[6] The government also argued that evidence relating to Munday's past smuggling was "inextricably intertwined" with his participation in the title-washing scheme.  The district court acknowledged but did not rule upon this issue.  On appeal, Munday contends nonetheless that the "prejudicial evidence was not inextricably intertwined with events occurring during the period of the charged conspiracy."  Rule 404(b) does not apply to "evidence of uncharged offenses that are intrinsic to the charged conduct."  *United States v. Dixon*, 901 F.3d 1322, 1344–45 (11th Cir. 2018) (quoting *United States v. Holt*, 777 F.3d 1234, 1262 (11th Cir. 2015)).  Evidence of criminal activity other than the charged offense is intrinsic and thus not subject to Rule 404(b) if it "arose out of the same transaction or series of transactions as the charged offense, is necessary to complete the story of the crime, or is inextricably intertwined with the evidence regarding the charged offense."  *Id*. at 1344–45 (quoting *Holt*, 777 F.3d at 1262).  We need not decide whether these facts indicate the evidence in question was "inextricably intertwined," however, because we find that the evidence was admissible on the grounds relied upon by the district court—that is, the exceptions to Rule 404(b).

and ultimately determined that his total offense level was 27.  Thus, Munday's advisory Guideline range fell between 78 and 97 months' imprisonment.

The district court then received recommendations from both parties regarding the sentence.  The government recommended 87 months and Munday recommended 24 months.  The court accepted neither recommendation, instead imposing a 144-month sentence on each of Munday's six counts to be served concurrently.  To justify the upward variance, the court noted (1) the sophistication of the title-washing scheme; (2) the length of time of the scheme; (3) the significant amount of loss the scheme caused; (4) the court's belief that a criminal history category of II "does not adequately reflect [Munday's] true criminal background"; (5) Munday's significant participation in the scheme; (6) Munday's lack of cooperation; and (7) Munday's activity during "the last several decades embracing and publicizing his criminal past" which were "full of braggadocio and zero remorse."  In sum, the court found that, since Munday's release from his previous imprisonment, "[h]e's made no efforts to become . . . a lawful member of society."

The district court also found it important "to reflect on the sentences of the three people in this conspiracy who most closely fit into Mr. Munday's participation."  Those persons were Johnson, who received 48 months, and two other individuals, who received 30 and 24 months, respectively.  The court noted

10

significant differences between Munday's situation and theirs, specifically that they had cooperated with the government and did not have criminal backgrounds as serious as Munday's.  Thus, even though those three individuals "might have been in the same or higher level in this scheme," the court concluded that giving Munday a higher sentence was "not an unwarranted sentencing disparity."

## II. Standards of Review

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003).  However, "even if an evidentiary ruling is erroneous, 'it will not result in a reversal of the conviction if the error was harmless.'"  *United States v. Langford*, 647 F.3d 1309, 1323 (11th Cir. 2011) (quoting *United States v. Docampo*, 573 F.3d 1091, 1096 (11th Cir. 2009)).  "An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights."  *Id.* (quoting *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999)).

We review the reasonableness of a sentence under an abuse-of-discretion standard.  *See Gall v. United States*, 552 U.S. 38, 51 (2007); *see also United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010).

## III. Discussion

### A. Rules 404 & 403 Issues

11

Munday contends that he was irreparably prejudiced at trial due to the admission of evidence describing his past as a smuggler and a videotape showing him using a flatbed truck. He argues this evidence is impermissible character evidence in violation of Rules 404(a)(1) and 404(b)(1), and also that the prejudicial effect of the evidence was not outweighed by any probative value in violation of Rule 403.[7]

Rule 404(a)(1) prohibits the admission of evidence of "a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." Similarly, Rule 404(b) prohibits the admission of evidence of "a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," except where such evidence is admitted "for another purpose, such as proving . . . knowledge . . . [and] absence of mistake . . . ." To be admissible at trial, Rule 404(b) evidence must (1) "be relevant to an issue other than the defendant's character," (2) be supported "by sufficient proof to allow a jury to find that the defendant committed the extrinsic act," and (3) "possess probative value that is not substantially outweighed by its undue prejudice, and the

---

[7] Munday also argues in passing that he was not provided sufficient notice regarding the government's intent to reference his experience as a "smuggler" or with "smuggling." This scant mention of the notice issue is insufficient to raise an argument on appeal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

evidence must meet the other requirements of Rule 403."[8]  *United States v. Sanders*, 668 F.3d 1298, 1314 (11th Cir. 2012) (quoting *United States v. Miller,* 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc)).  An exclusion based on Rule 403, however, "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility."  *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003).  Furthermore, a trial court's limiting instruction to a jury "can diminish any unfair prejudice caused by the evidence's admission."  *United States v. Brown*, 665 F.3d 1239, 1247 (11th Cir. 2011).

We first find unavailing Munday's contention that references to his past as a smuggler and a video clip showing him using a flatbed truck were impermissible character evidence.  Pursuant to Rule 404(b), the government offered the evidence in question relating to Munday's past acts as a smuggler who used a tow truck to evade law enforcement to establish that Munday had the requisite intent, knowledge of the skills needed, and absence of mistake in the instant offense.[9]

---

[8] Rule 403 provides that a court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

[9] By not pleading guilty, Munday put his intent at issue, which was a required element for mail fraud.  § 1341 ("Whoever, having devised or *intending* to devise any scheme or artifice to defraud . . . .");  *see also United States v. Matthews*, 431 F.3d 1296, 1311 (11th Cir. 2005) (finding that in a conspiracy case a not guilty plea "renders the defendant's intent a material issue" (quoting *United States v. Roberts*, 619 F.2d 379, 383 (5th Cir. 1980))).

13

These ends were reasonable in light of testimony describing Munday's main role in the title-washing scheme as being responsible for "transportation" and "logistics" of vehicles. *See United States v. Jernigan*, 341 F.3d 1273, 1281 (11th Cir. 2003) (finding that a defendant's previous possession of a weapon in a car "logically bear[s] on his knowledge of the presence of a gun at the time Jernigan's car was pulled over"). Accordingly, the district court properly found that these items of evidence fell within Rule 404(b)(2)'s exceptions to the general prohibition on prior act evidence, and thus were relevant to an issue other than Munday's character.

We also find that references to Munday's past as a smuggler and the "Cocaine Cowboys" video clip were not unduly prejudicial under Rule 403. During the pre-trial motion in limine hearing, the district court ensured that any prejudicial impact was mitigated by excluding references to drugs and the term "cocaine cowboy" throughout the trial. The court repeatedly provided a limiting instruction to the jury which forbid them from considering evidence of prior similar acts as evidence of guilt in the title-washing scheme. At no time during trial did the government specify that Munday's past smuggling resulted in a conviction. In fact, the government itself specified in its closing argument that the prior similar act evidence was meant to establish Munday's "knowledge . . . or intent necessary to commit the crime charged in the indictment." And the descriptions of Munday's expertise in smuggling through the act of towing trucks

14

and the "Cocaine Cowboys" video clip supporting those descriptions had significant probative value given Munday's role in the title-washing scheme. As Johnson testified, such evidence showed that "[Munday] was a person who was able to move things around, . . . and he was able to evade law enforcement successfully . . . ."

Munday contends nonetheless that references to "smuggling" had special import given the geographical location of the trial—southern Florida—because of that region's unfortunate familiarity with "drug smuggling" in the 1970's and 1980's. This unsupported argument is speculative at best and does not tip the scales toward prejudice.

Accordingly, we find that none of the challenged evidence was unduly prejudicial in light of its probative value, thus satisfying the requirements of Rules 404(b) and 403. The district court did not abuse its discretion in admitting this evidence.

But even if this evidence should have been excluded, Munday has not shown that such an error, when weighing "the record as a whole," had a "substantial influence on the outcome" of his trial. *Hands*, 184 F.3d at 1329. In other words, any error that could be shown would be harmless in light of the totality of the evidence presented at trial. Beyond the references to Munday's past smuggling and a video clip showing him towing trucks, the government presented ample

15

evidence at trial to demonstrate that Munday committed the mail fraud in question and was engaged in the conspiracy involving the title washing. The government presented eight witnesses who testified against Munday, including three co-conspirators, an individual from whom Munday purchased and picked up a car used in the scheme, and two law enforcement officers. Each co-conspirator testified to Munday's knowledge and participation in the scheme. One law enforcement officer testified that he actually observed Munday at a sham auction—and Munday himself admitted to being there. The government also introduced numerous exhibits, including fraudulently obtained car titles signed by Munday and delivered to a co-conspirator, checks provided to and signed by Munday in connection with cars he purchased and delivered in the scheme, photographs of Munday's property where numerous cars were hidden from lienholders, and a videotaped confession of Munday admitting to his participation in what he called the "hokey doke" scheme (the process Johnson used for "getting titles through the auctions"). Accordingly, in light of the large body of evidence presented by the government, we conclude that any assumed prejudice or harm caused to Munday by references to his past as a smuggler or the video displaying him driving a flatbed truck "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *Id.* (quoting *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992)); *see also United States v.*

16

*Khanani*, 502 F.3d 1281, 1292 (11th Cir. 2007) ("No reversal will result if sufficient evidence uninfected by any error supports the verdict, and the error did not have a substantial influence on the outcome of the case.") (citing *Hands*, 184 F.3d at 1329).

## B. Sentencing Issue

Munday also challenges the district court's 47-month upward variance from its Guidelines calculation on substantive grounds.

On appeal, Munday bears the burden to show the sentence was unreasonable in light of the record and the 18 U.S.C. § 3553(a) factors. *Tome*, 611 F.3d at 1378. The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to protect the public; (4) the kinds of sentences available; (5) the Sentencing Guidelines range; (6) pertinent policy statements of the Sentencing Commission; (7) the need to avoid unwanted sentencing disparities; and (8) the need to provide restitution to victims. 18 U.S.C. § 3553(a). The weight given to each § 3553(a) factor is within the district court's sound discretion. *United States v. Kuhlman*, 711 F.3d 1321, 1327 (11th Cir. 2013).

Should the district court vary upwards from its Guidelines range calculation, "it must consider the extent of the deviation and ensure that the justification is

17

sufficiently compelling to support the degree of the variance." *Tome*, 611 F.3d at 1378 (quoting *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008)); *see also United States v. Rosales-Bruno*, 789 F.3d 1249, 1259 (11th Cir. 2015). The court's justification must be "compelling enough to support the degree of the variance and complete enough to allow meaningful appellate review," but an "extraordinary justification" is not required for a sentence outside the guideline range. *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (quotations omitted). On review, we do not presume that a sentence outside the Guidelines range is unreasonable, but we must consider the extent of any variance and "give due deference to the district court's decision that the § 3553 factors, on a whole, justify the extent of the variance." *United States v. Turner*, 626 F.3d 566, 574 (11th Cir. 2010) (internal quotations omitted).

Munday contends that his sentence is substantively unreasonable due to the disparity between his sentence and those of his co-conspirators. To this end, he argues that he was "far from the most culpable" of the co-conspirators, that he should not be dealt a "trial tax" for declining a plea deal when the others accepted it, and also that the district court unfairly characterized his publicization of his criminal past as "full of braggadocio."

We find these arguments unpersuasive. As described above, the district court demonstrated thoughtful appreciation for § 3553(a)(6)'s requirement that it

18

"avoid imposing a sentence that results in unwarranted sentencing disparities" by "reflect[ing] on the sentences" of co-conspirators with similar participation as Munday.  In other words, the district court contemplated Munday's relative culpability and incorporated that consideration into its sentencing decision. Beyond this, the district court supported its 47-month upward variance by finding that Munday's criminal history did not "adequately reflect his true criminal background," and that the title-washing scheme was "sophisticated" and "took place over a lengthy period of time involving a significant amount of loss."  These are exactly the type of considerations that are appropriate under § 3553(a).  And whatever disagreement Munday might have with the district court's deduction about what his numerous publications regarding his past crimes might suggest about his present attitude, he cannot deny that he demonstrated a clear lack of remorse for the instant offense during the sentencing hearing, where he claimed that he "still feels that he is not responsible in this case."  Moreover, the fact that Munday's 144-month sentence is substantially lower than the applicable statutory maximum of 240 months "points strongly to reasonableness." *United States v. Nagel*, 835 F.3d 1371, 1377 (11th Cir. 2016).  In sum, we find these are "significant justifications" warranting an upward variance.  *Rosales-Bruno*, 789 F.3d at 1256 (finding that a "major" upward variance of 60 months was reasonable).

19

## IV. Conclusion

We therefore find that the district court did not abuse its discretion in admitting evidence establishing that Munday was once a smuggler or towed vehicles in connection with smuggling activity.  We further find that the district court did not abuse its discretion by varying above the Guidelines range by 47 months.

**AFFIRMED.**